BINGHAM MCCUTCHEN LLP
James G. Snell (SBN 173070)
james.snell@bingham.com
Nargues Motamed (SBN 260289)
nargues.motamed@bingham.com
1117 S. California Avenue
Palo Alto, California 94304-1106
Telephone: 650.849.4400
Facsimile: 650.849.4800

Attorneys for Plaintiff
MENTOR GRAPHICS CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MENTOR GRAPHICS CORPORATION, an Oregon corporation,<br><br>Plaintiff,<br><br>v.<br><br>SIGMA DESIGNS, INC., a California corporation,<br><br>Defendant. | No. _____<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>**(1) COPYRIGHT INFRINGEMENT;**<br>**(2) BREACH OF CONTRACT;**<br>**(3) UNJUST ENRICHMENT; AND**<br>**(4) AUDIT AND ACCOUNTING**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Mentor Graphics Corporation ("Mentor") for its Complaint against Defendant Sigma Design Inc. ("Sigma") alleges as follows based on its personal knowledge as to itself, and on information and belief where indicated below:

**I.     INTRODUCTION**

1. This case involves defendant Sigma's willful copyright infringement and breaches of contract related to plaintiff Mentor's Nucleus embedded software.

2. Mentor brings this lawsuit based on Sigma's continued widespread, deliberate practice of unauthorized copying and distribution of Mentor's embedded software, and repeated breaches of the license agreement between Mentor and Sigma.

**II. THE PARTIES**

3. Plaintiff Mentor is an Oregon corporation with its principal place of business in Wilsonville, Oregon.

4. Defendant Sigma is a California corporation with its principal place of business in Milpitas, California.

**III. JURISDICTION**

5. Mentor's claims for copyright infringement arise under the Copyright Act, 17 U.S.C. § 101, *et seq.* Accordingly, this Court has subject matter jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 1338.

6. This Court has supplemental subject matter jurisdiction over Mentor's state law claims pursuant to 28 U.S.C. § 1367 because these claims are so related to Mentor's claims under federal law that they form the same case or controversy and derive from a common nucleus of operative facts.

7. This Court also has original subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because there is a complete diversity of citizenship between the Plaintiff and Defendant, and the amount in controversy exceeds $75,000.

**IV. VENUE**

8. Venue in this District is appropriate pursuant to 28 U.S.C. § 1400(a) because Sigma resides in this District.

**V. INTRADISTRICT ASSIGNMENT**

9. This action alleges, among other things, claims for copyright infringement. It is an intellectual property action and may be assigned on a district-wide basis pursuant to Civil L.R. 3-2(c).

**VI. FACTUAL ALLEGATIONS**

10. Mentor is a technology leader in electronic design automation ("EDA"), providing software and hardware design solutions that enable companies to develop better products faster and more cost-effectively. Mentor offers a number of innovative products and solutions, including embedded software called Nucleus ("Software" or "Mentor's Software").

Embedded software is software designed to control devices that are not typically thought of as computers, such as televisions. Mentor's Software is a real time operating system integrated with power management features (such as energy reduction, deep sleep modes, and power/clock gating) which allows device manufacturers to include such features in their devices. Mentor's Software is currently embedded on over 3 billion devices in a range of industries including consumer electronics, medical devices and mobile devices. Mentor licenses its Software directly to device manufacturers and also to third parties like defendant Sigma who incorporate Mentor's Software in microchips which are then sold to end-users for inclusion in consumer products like televisions.

### A. Mentor's License Agreement With Trident (And Later Assumed By Sigma)

11. On March 27, 2008, Mentor licensed its Software to Trident Microsystems (Far East) Ltd. ("Trident") pursuant to a Reference Platform License Agreement For Embedded Software ("License" or "Agreement"), a true and correct copy of which is attached as Exhibit A.[1] That License, as described below, was assumed by Sigma and is the subject of Mentor's breach of contract claim. The License allowed Trident to use Mentor's Software in connection with Trident's system-on-a-chip ("SoC") products offered to manufacturers of electronics such as televisions and set-top boxes. A SoC is an integrated circuit that integrates all components of an electronic system onto a single microchip. Trident offered its SoC to manufacturers as a component that would enhance visual displays (*e.g.*, high definition and 3D graphics) when integrated in the manufacturer's products and Mentor's Nucleus Software added capabilities to Trident's SoC. With Mentor's Software, for example, Trident could offer manufacturers a SoC that included key technologies required for advanced television connectivity. The various SoCs offered under the License are called "Reference Platform(s)."

12. Subject to certain restrictions, the License granted Trident both the right to use the Software internally and to sublicense the Software to third party end-users. With respect to internal uses, Section 3.1 provided Trident with a "nonexclusive and nontransferable license"

---

[1] License fee amounts have been redacted in the License and related attachments.

1 to use and develop the Software for "(a) for internal business purposes; (b) on the specified number of computer work stations and sites for which an applicable license fee is paid as set forth in the applicable attachment or quotation." Ex. A at § 3.1.

13. The License also included restrictions that "Licensee may copy Software only as reasonably necessary to support an authorized use." Ex. A, § 4.1. Further, Trident was required to include on each copy "all notices and legends embedded in Software and affixed to its medium and container as received from Mentor Graphics" and Trident was required to "maintain a record of the number and location of all copies of Software, including Software or copies . . . merged with other software" and to "make those records available to Mentor Graphics upon request." *Id.*

14. With respect to third party end-users, the License allowed Trident to sublicense Mentor's Software to such end-users, Exhibit A at § 3.2, but the sublicensing rights were subject to several conditions, including that Trident pay to Mentor appropriate fees and that the Software be "bundled with Licensee's [Trident's] Reference Platform . . ." when shipped to end-users. *Id.* Trident was also required to ensure that the end-user "first execute a written agreement with either Trident or Mentor Graphics," that included specific restrictions on the end-user sublicensee, including, for example, that the end-user not exceed the license rights granted under the License and that the agreement be sufficient to enable Trident to comply with the terms of the License. Ex. A at §§ 3.2 and 3.3. End-users were also required to provide the end-user's product names, product part numbers, processor units, and development locations to Trident. Ex. A at § 3.3.

15. The License also required that Trident pay Mentor quarterly sublicense payments and provide Mentor with detailed quarterly payment statements showing:

> (a) the number of sublicenses or demonstration copies distributed during the preceding quarter; (b) a description of the products including Source Code, Object Code or Executable Code involved; (c) the end-user(s) to which such licenses were granted including: company name, contact person, physical address, phone and fax and quantity of licenses to each; (d) the license fee paid by each end-user; (e) the quantity of Embedded Software licenses for which maintenance was ordered during the period by End-user; and (f) a calculation of the fee due to

Mentor Graphics . . .

Ex. A, §2.4.

16. Trident was also required to provide Mentor copies of the applicable signed license agreements from each end-user sublicensed. *Id.*

17. The License allowed Trident to grant sublicenses to end-users of varying degree, including (1) a source code license that allowed end-users to use and modify Mentor's Software as combined with a Reference Platform and embed the Reference Platform with Mentor's Software in end-users' final products for distribution to consumers, (2) an object/binary license that allowed end-users the right to use Mentor's software solely for the purpose of modifying the Reference Platform (but not modifying Mentor's software code) and embedding the Reference Platform with Mentor's Software in end-users' final products for distribution by end-users to consumers, and (3) a manufacturing-only license solely to embed Trident's Reference Platform, including Mentor's Software, in an executable code format ready to be programmed in end-users' final products for distribution by end-users to consumers. Ex. A, § § 3.2 and 3.3. These sublicenses were subject to different payments from Trident to Mentor of 90%, 70%, and 40% of Mentor's then-current list price for each Software component, respectively. Ex. A, § 3.2 (a)-(c). The combinations of part numbers, processors, and development locations the end-user planned to use Mentor's Software on was to then be multiplied against the applicable percentage of Mentor's current price list for each Software component.

18. The terms of specific license grants were further defined in five License attachments. Each attachment identified the specific geographic development locations and processors in which Trident could use Mentor's Software and identified which of Trident's Reference Platforms were permitted to incorporate Mentor's Software. The License attachments also include the Software license fees.

19. Attachment A-1 was entered into concurrently with the License and revised on April 11, 2008. Pursuant to the revised Attachment A-1, Trident's Reference

Platform known as HiTVPro-SX2 ("SX2") was licensed to incorporate Mentor's Software. Ex. A, Revised A-1. Attachment A-2 was entered into on January 29, 2010, and licensed Trident to incorporate Mentor's Software on Trident's Reference Platforms HiDTV TMSD ("TMSD"), HiDTV Pro SX ("SX"), HiDTV Pro SA1 ("SA1") and HiDTV Pro SX-3 ("SX3"). Ex. A, A-2. Attachments A-3 and A-4 were entered into February 23, 2011, and licensed Trident to incorporate Mentor's Software on Reference Platforms HiDTV Pro SX-5 ("SX5") and Fusion (Attachment A-3) and HiDTV Pro SX-L ("SXL") (Attachment A-4). Ex. A, A-3 and A-4. Attachment A-5, was entered into on July 28, 2011 and was a limited term "buyout" license for use of Mentor's Software by Philips Consumer Lifestyle ("Philips") beginning July 29, 2011 and ending June 30, 2013. This attachment licensed Trident to sublicense and/or distribute the Software bundled with its Fusion Reference Platform to Philips and enabled Philips to use the Reference Platform at one Philips location, modify the Reference Platform, and incorporate and embed the Reference Platform into Philips' products until June 30, 2012. Ex. A, A-5.

20. The License also contained an audit clause that required Sigma to retain records and allowed Mentor to audit compliance with the License: "Licensee shall keep all necessary records for purposes of determining compliance with its obligations under this Agreement. Mentor Graphics shall have the right to audit, by prior appointment . . . Licensee's relevant records and accounts . . . The rights and obligations of this Section 6 shall survive the expiration or termination of this Agreement." Ex. A, § 6.

**B.  Trident's Bankruptcy Proceeding**

21. In 2012, Trident filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As part of that proceeding, Trident notified Mentor that it planned to sell its set-top box and Digital Television Business ("DTV") units to Sigma. Mentor required, as part of that proceeding, information relating to Trident's performance under the License. Mentor learned through that process that Trident was not in compliance with the license in a number of respects, including that Trident had not procured sublicenses or paid sublicense fees for seventeen end-user customers.

22. As a condition to the assignment of the License from Trident to Sigma,

Mentor required that Trident make payment to compensate for Trident's breaches of the License and misuse of Mentor's intellectual property. In June 2012, the parties stipulated to a payment to cure Trident's defaults in existence as of the closing of the sale of Trident's set-top box and DTV units to Sigma, including defaults related to sublicense fees for which Trident was responsible.

23. The stipulation made clear that it resolved only defaults in existence as of the closing and did not amend the License: "For the avoidance of doubt, this Stipulation resolves the Motion by Mentor regarding the cure of any defaults in existence as of the Sale Closing under the Agreements and any sublicenses thereunder, but does not amend the Agreement."

24. Following Mentor's stipulation with Trident, the Bankruptcy Court entered an Order approving the stipulation and settlement between Trident and Mentor and Sigma assumed the License.

**C. Sigma's Breach of the License and Unauthorized Copying, Use, and Distribution of Mentor's Software**

25. Despite assuming the License without amendment, Sigma knowingly did not comply with its requirements, but instead breached the License, infringed Mentor's copyrights, and delayed, obfuscated, and actively concealed its infringement, breaches of contract, and other unlawful conduct.

26. On information and belief, Sigma has not used the software solely for its internal business purposes and has not complied with its processor and development location restrictions.

27. In dealing with third-party end users, Sigma has not obtained the sublicenses required by the License, has not provided quarterly reports as required by the License and, on information and belief, has not bundled the Software with its Reference Platforms. Instead, Sigma has knowingly engaged in the unauthorized reproduction and distribution of Mentor's Software. In fact, Sigma has not provided to Mentor *any* sublicense for *any* end-user, despite repeated requests from Mentor. Moreover, despite the fact that Sigma acknowledges its reporting obligations under the License, Sigma has failed to provide the reports as required.

28. Mentor is informed and believes that Sigma continued to ship, make available, and/or intentionally encourage the unauthorized use, copying and distribution of Mentor's Software to some if not all of the end-users listed in the Trident stipulation, but Sigma has not procured sublicenses with such end-users or provided quarterly reports as required.

29. Mentor is also informed and believes that other Reference Platforms and other Sigma products, including but not limited to Simga's FRC-V and UXL Reference Platforms, incorporate Mentor's Software without authorization. Sigma's website shows that it makes FRC-V and UXL available to end-users. Sigma does not have a license to develop and use Mentor's Software on FRC-V or UXL.

30. Mentor also twice informed Sigma prior to the expiration of Attachment A-5 that Sigma's sublicense of Fusion for Philips was about to expire on June 30, 2013 and sought Sigma's confirmation that Philips would not incorporate Mentor's Software in Philips' products after the expiration date. Sigma refused to provide such confirmation but continued to ship product to Philips containing Mentor's Software and/or for use with Mentor's Software.

31. Based on Sigma's misuse of Mentor's intellectual property, repeated breaches of the License, and failure to honor the audit requirements, Mentor provided notice to Sigma confirming that the License was terminated. When Mentor demanded that Sigma return its Software, Sigma acknowledged it was still providing Mentor's Software to a number of Philips entities and other third party companies in connection with the expired Attachment A-5 to the License.

32. Mentor informed Sigma in late 2012 that it was in breach of the terms of the License and demanded that Sigma cure its breaches including by: 1) paying requisite Reference Platform license fees, 2) paying for past due sublicense fees, and 3) fully cooperating with Mentor in an audit. Sigma did not provide a meaningful response. Mentor then notified Sigma that the License was terminated and sought Sigma's confirmation that it would "immediately cease to sell, distribute or otherwise use any and all products that incorporate Mentor Graphics' proprietary embedded software. . ." Sigma responded by inviting and agreeing to cooperate with an audit pursuant to the License.

**D.     Sigma Frustrates The Audit And Conceals Its Copyright Infringement**

33.     Mentor scheduled the audit visit in September 2013. Mentor's auditors sent a document request to Sigma before the audit and arranged for certain Sigma employees to be available to assist with the audit. The auditors arrived at Sigma on the scheduled date, but Sigma did not provide the requested documents, allow access to the information requested by the auditors, or make necessary staff available as previously agreed. Mentor incurred costs in the attempted audit, but the auditors were forced to terminate the audit a little more than a week later based on Sigma's refusal to cooperate.

34.     Based on public information and limited information provided by Sigma, however, the auditors identified further evidence that Sigma was not complying with the License and was misusing Mentor's intellectual property, including identifying several additional companies who Sigma had apparently provided Mentor's Software to and who had never before been disclosed to Mentor. The auditors also located evidence that suggested Sigma may not have been bundling the Software with the Reference Platforms as required by the License. The auditors raised these issues with Sigma, but Sigma did not respond in any meaningful way.

35.     Mentor brings this action to address Sigma's unauthorized, willful and concealed use, copying and distribution of Mentor's Software, Sigma's intentional encouragement and inducement of end-users to use and copy Mentor's Software, and Sigma's multiple breaches of the License, including, among other things, (1) Sigma's copying and distributing of Mentor's Software outside the boundaries of the License and without honoring the conditions and restrictions imposed by the License; (2) Sigma's failure to enter into sublicense agreements with End-users; (3) Sigma's breach of the requirement to provide complete and accurate quarterly reports; (4) Sigma's breach of the payment provisions of the License by not making payments required under the License when they were required to be made; (5) Sigma's breach of the audit requirements of the License; (6) Sigma's failure to use the Software as conditioned in the License; (7) Sigma's provision of Mentor's Software to end-users without notification to, or authorization by, Mentor; (8) Sigma's knowingly providing and continuing to provide to Philips chips that use Mentor's Software despite expiration of Attachment A-5 and

1  despite Mentor's repeated notices that the Philips sublicense was expiring; and (9) Sigma's
2  refusal to confirm that end-users have ceased use of Mentor Software following termination of
3  the License.

## First Claim for Relief

## Direct, Contributory, and Vicarious Copyright Infringement

36. Mentor incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

37. Sigma has used, copied, and distributed Mentor's Software without authorization and that Software is protected by the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq.* Mentor owns a valid and enforceable copyright in its software applications and software and support materials, which are creative works of original authorship. Mentor has obtained Certificates of Registration from the Register of Copyrights that cover the software applications and software and support materials taken and copied by Sigma.

38. Mentor owned exclusive rights to each of the copyrights at issue in this case at a point in time during which Sigma infringed those exclusive rights.

39. Sigma has infringed copyrights in Mentor's Software and documentation, including the Software and documentation covered by the below certificates which relate to the unauthorized versions of Software which Sigma used, copied, and distributed to end-users. These certificates are identified, dated, and numbered as follows:

| Title of Work | Registration Date | Registration No. |
|---|---|---|
| Nucleus RTX | 8/2/1990 | Txu 000-455-790 |
| Nucleus Plus, v. 1.0 | 9/2/1993 | TX 5-059-738 |
| Nucleus Plus, v. 1.1 | 9/2/1999 | TX 5-045-395 |
| Nucleus Plus, v. 2x | 12/20/2013 | TXu001-878-335 |

40. Through the acts alleged above, including but not limited to Sigma's reproduction and distribution of Mentor's Software outside the boundaries of the License, its creation of unlicensed works derived from these copies, and its reproduction and distribution of

Mentor's Software without notification to or authorization by Mentor, Sigma has violated the exclusive rights of Mentor to control the reproduction, creation of derivative works, and distribution of its copyrighted Software and materials, including material covered by the registrations listed above.

41. In addition to directly infringing the exclusive rights of Mentor, Sigma has contributory and/or vicariously infringed the exclusive rights of Mentor's Software and documentation by controlling, directing, intentionally encouraging, inducing, or materially contributing to the copying, distribution, public display, or creation of derivative works from Mentor's copyrighted software applications and materials. Sigma also obtained a direct financial benefit from the above alleged infringing activities while declining to stop such activities.

42. Sigma knew or should have known that copying, distributing, publicly displaying, and creating derivative works of and from Mentor's Software and materials, which Sigma copied and provided to end-users who had no license to copy, distribute, publicly display, or create derivative works from the materials and software, infringed the exclusive rights of Mentor in the software and materials.

43. Sigma's acts were willful and intentional and constitute both direct and indirect copyright infringement under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq*.

44. Mentor has been, and will continue to be, damaged by such actions in an amount to be proven at trial, including profits attributable to the infringement not taken into account in computing actual damages under 17 U.S.C. § 504(b). Mentor is entitled to statutory damages under 17 U.S.C. § 504(c) based on Sigma's infringements after the dates of copyright registration. Mentor is also entitled to attorneys' fees.

45. Sigma's infringement of Mentor's exclusive rights has also caused Mentor irreparable injury. Unless restrained and enjoined, Sigma will continue to commit such acts. Mentor's remedies of law are not adequate to compensate Mentor for these inflicted and threatened injuries, entitling Mentor to remedies including injunctive relief as provided by 17 U.S.C. § 502, and an order impounding or destroying any and all infringing materials pursuant to 17 U.S.C. § 503.

## Second Claim for Relief

## Breach of Contract

46. Mentor incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

47. On or about March 27, 2008, Mentor and Trident entered into the License, a copy of which is attached as Exhibit A and made a part of this Complaint.

48. Sigma assumed the License on or about June 8, 2012 without amendment.

49. Mentor has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the License.

50. Sigma has not performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the License. Sigma's breaches of the License include, but are not limited to, the failure to provide complete and accurate quarterly reports as required by Section 2.4 of the License, the failure to pay sublicense fees as required by Section 2.3 of the License, and the failure to allow Mentor to audit Sigma's compliance.

51. As a result of Sigma's breach of the contract, Mentor has suffered damages in an amount to be proven at trial.

## Third Claim for Relief

## Unjust Enrichment

52. Mentor incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

53. Upon information and belief, beginning on or about June 8, 2012, and continuing thereafter, Sigma, without Mentor's permission or knowledge or consent, provided to others products that incorporated Mentor's Software that were neither authorized nor paid for under the License.

54. It would be unjust for Sigma to retain any value it obtained as a result of its wrongful conduct.

55. By reason of Sigma's acts as alleged above, Sigma has unjustly enriched itself in an amount which is not yet fully ascertainable but which is at Mentor's expense, and Sigma should be required to return amounts obtained unjustly to Mentor.

### Fourth Claim for Relief

### Audit and Accounting

56. Mentor incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

57. On or about March 27, 2008, Mentor and Trident entered into the License, a copy of which is attached as Exhibit A and made a part of this Complaint.

58. Sigma assumed the License on or about June 8, 2012. The License authorized Sigma to incorporate Mentor's Software into specific Reference Platforms. The License authorized Sigma to sublicense its Software when bundled with Sigma's Reference Platforms pursuant to sublicense agreements. The License also required Sigma to provide regular reports of sublicenses, including the contact information for the end-users and the product name(s), part number(s), and development location(s) related to the end-users use of Sigma's Reference Platform that incorporated Mentor's Software.

59. Upon information and belief, beginning on or about June 8, 2012, and continuing thereafter, Sigma, without the consent of Mentor, reproduced, distributed, and sublicensed Mentor's Software in ways neither authorized nor paid for under the License.

60. Mentor is due a license fee for any unlicensed Reference Platforms that incorporated Mentor's Software. Mentor is due sublicense fees from the unauthorized distributions of Mentor's Software.

61. The amount of money due from Sigma to Mentor is unknown to Mentor and cannot be ascertained without an accounting of the receipts of the aforementioned Reference Platforms and sublicenses.

62. Prior to the filing of this lawsuit, Mentor exercised its right to audit Sigma's records pursuant to the License. Sigma refused to provide access to source documentation regarding the use, copying, or distribution of Mentor's Software and continues to

fail and refuse to render the accounting and to pay Mentor the monies it owes. Sigma should be required to allow an audit and provide an accounting of amounts owed to Mentor.

## Prayer for Relief

WHEREFORE, Mentor respectfully prays for the following:

A. For a preliminary and permanent injunction restraining Sigma, its officers, agents, servants, employees, attorneys, and those in active concert or participation with it, from the following:

1. Copying, downloading, distributing, using, or creating derivative works from Mentor's Software or support materials in any way, including for any business purpose;

2. Facilitating the copying, distribution, or use of any Mentor Software or support materials by any end-user or party who did not have a current, valid, existing sublicense for Mentor's Software;

B. For an Order directing Sigma to return Mentor's property, including, without limitation, Mentor's confidential, proprietary, and copyrighted software, documentation, internal documents, and other materials;

C. For an Order impounding or destroying all infringing materials pursuant to 17 U.S.C. § 503;

D. For restitution and disgorgement of all ill-gotten gains unjustly obtained and retained by Defendants through the acts complained of here;

E. For damages to be proven at trial, including the cost of the audit and other damages related to Sigma's breaches of contract;

F. For actual damages, including under 17 U.S.C. § 504(b);

G. For statutory damages pursuant to 17 U.S.C. § 504(c), including willful infringement under § 504(c)(2);

H. For pre- and post- judgment interest;

I. For an accounting;

J. For an order awarding Mentor its attorneys' fees and costs; and

K.     For an order awarding Mentor such other and further relief as the Court deems just and proper.

DATED:  February 18, 2014                    BINGHAM MCCUTCHEN LLP


                                             By:      */s/ James G. Snell*
                                                   James G. Snell
                                                   Nargues Motamed
                                                   Attorneys for Plaintiff
                                                   MENTOR GRAPHICS CORPORATION

COMPLAINT FOR DAMAGES

**DEMAND FOR JURY TRIAL**

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff Mentor Graphics Corporation demands a trial by jury on all issues triable by a jury.

DATED:  February 18, 2014                    BINGHAM MCCUTCHEN LLP


By: _____*/s/ James G. Snell*_____
James G. Snell
Nargues Motamed
Attorneys for Plaintiff
MENTOR GRAPHICS CORPORATION

COMPLAINT FOR DAMAGES